## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CYNTHIA FLOWERS-SMITH AND<br>HARVEY SMITH<br>403 Gillette St. Apt. 207<br>La Crosse, WI 54603 | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)<br>)<br>) |
| | )<br>) |
| WELLNX LIFE SCIENCES, INC.<br>d/b/a NXLABS f/k/a NXCARE, INC.<br>6335 Edwards Blvd.<br>Mississauga, Ontario<br>L5T 2W7 Canada | )<br>)<br>)<br>)<br>) |
| And | )<br>)<br>) |
| GLOBAL HEALTH TECHNOLOGIES, INC.<br>6335 Edwards Blvd.<br>Mississauga, Ontario<br>L5T 2WL Canada | )<br>)<br>)<br>) |
| And | )<br>)<br>) |
| PLATINUM US DISTRIBUTION, INC.<br>d/b/a WELLNX LIFE SCIENCES, USA<br>c/o United Corporate Services, Inc.,<br>874 Walker Rd., Suite C<br>Dover, Delaware 19904 | )<br>)<br>)<br>)<br>) |

Right column:

**COMPLAINT FOR
PERSONAL INJURY &
PRODUCT LIABILITY**

**Case No. 15-cv-168**

## INTRODUCTION

1.    Plaintiffs Cynthia Flowers-Smith and Harvey Smith, by and through the undersigned attorneys, hereby bring this cause of action against Defendants Wellnx Life Sciences, Inc. d/b/a NxLabs f/k/a NxCare, Inc., Global Health Technologies, Inc., and Platinum US Distribution, Inc. d/b/a Wellnx Life Sciences, USA (collectively "Defendants").

2.      This is a personal injury action brought against Defendants for injuries sustained by Plaintiff Cynthia Flowers-Smith as a result of ingesting Defendants' defective weight loss supplement SLIMQUICK® ("SLIMQUICK®" or the "Product").

## PARTIES

3.      Plaintiff, Cynthia Flowers-Smith ("Mrs. Flowers-Smith"), a resident of La Crosse, Wisconsin, La Crosse County, suffered liver toxicity after ingesting SLIMQUICK® in November, 2013.

4.      Plaintiff, Harvey Smith, a resident of La Crosse, Wisconsin, La Crosse County, is the husband of Mrs. Flowers-Smith.

5.      Defendant Wellnx Life Sciences, Inc. is a Canadian corporation with its principal place of business in Mississauga, Ontario.  Wellnx Life Sciences, Inc. was formerly known as NxCare, Inc.  Wellnx Life Sciences, Inc. currently does business under the name NxLabs, Inc. Upon information and belief, Wellnx Life Sciences, Inc. is a developer and marketer of weight loss supplements, including the SLIMQUICK® line, which is manufactured by a third party under contract with Defendants.  Pursuant to the Hague Convention of 1965, Wellnx Life Sciences, Inc. can be served via the Ministry of the Attorney General, Courts Administration, Court House (Provincial Division), 393 Main Street, Halleybury, Ontario, Canada P0J 1K0.

6.      Defendant Global Health Technologies, Inc. is a Canadian holding company with its principal place of business in Mississauga, Ontario.  Wellnx Life Sciences, Inc. is wholly owned by Global Health Technologies, Inc.  Pursuant to the Hague Convention of 1965, Global Health Technologies, Inc. can be served via the Ministry of the Attorney General, Courts Administration, Court House (Provincial Division), 393 Main Street, Halleybury, Ontario, Canada P0J 1K0.

7.      Defendant Platinum US Distribution, Inc., d/b/a Wellnx Life Sciences, USA, is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Upon information and belief, Platinum US Distribution Inc. and Wellnx Life Sciences, USA market and distribute weight loss supplements, including the SLIMQUICK® line, which Defendants contract to be manufactured by third parties.  The registered agent for Platinum US Distribution Inc. is United Corporate Services, Inc., 874 Walker Rd., Suite C Dover, Delaware 19904.

8.      The products defined herein are sold generally by a group of retailers, some of whose identities are known to Plaintiff at the present time, and some of whose identities are unknown to Plaintiff at the present time.[1]

## JURISDICTION

9.      This action is brought pursuant to 28 U.S.C. § 1332 (a) in that the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs, and the Plaintiff is a citizen of a different state than all Defendants, some of whom are citizens of Canada, a foreign state, and others of whom are citizens of various states in the United States. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

10.      This court has personal jurisdiction over each of the Defendants.

    a)      The Defendants have purposefully availed themselves of the laws and markets of the State of Wisconsin by (i) causing their products to be distributed and sold in Wisconsin; (ii) directing internet sales of their products in Wisconsin, including but not limited to, through many of the retailers identified in footnote 1; (iii) receiving substantial revenues from sales of their products in Wisconsin; (iv) making representations to Wisconsin consumers regarding those products, a significant number of which constitute incomplete, inaccurate, and/or false and deceptive

---

[1] The SLIMQUICK website identifies its retailers as Wal-Mart, Target, Costco, Loblaw's, Walgreens, Loeb, Vitamin Shoppe, Zellers, BJs Wholesale Club, Rexall, CVS/Pharmacy, GNC, Fred Meyer, Kroger, Safeway, Sam's Club, Rite Aid, Duane Reade, Vitamin World, K-Mart, Shoppers Drug Mart, Hannaford, Ahold, Metro and Supervalu. http://www.wellnx.com/retail.php

3

representations; and/or (v) negligently, recklessly, or intentionally making assertions of safety, and scientific, clinical or quantifiable fact to Wisconsin consumers in labeling and advertisements that would cause a reasonable person to believe that the assertion is true, without, at the time the assertion was made, possessing factually objective scientific, clinical, or quantifiable evidence that substantiates the assertion.

b)      The Defendants entered into contractual arrangements with some or all the retailers, some or all of which operate retail stores in Wisconsin where the products at issue were sold.

c)      The Defendants directed the sale of products through retailers in Wisconsin.

d)      The Defendants directed the sale of products to Wisconsin consumers through orders placed over the Internet.

e)      The actions, omissions and relationships set out herein further show that the Defendants purposefully availed themselves of the laws and markets of Wisconsin, and of the other States in the United States, for the purposes of manufacturing the SLIMQUICK® products described herein and disseminating those products through the stream of interstate commerce.

## BACKGROUND

11.     In early November, 2013, Plaintiff Flowers-Smith began to ingest SLIMQUICK® Fat Burner, as instructed by the dosing chart on the bottle.

12.     On or about November 22, 2013, Mrs. Flowers-Smith presented to La Crosse Hospital Emergency Department ("ED") with complaints of fatigue, indigestion, persistent nausea, and constipation. Mrs. Flowers-Smith advised these symptoms were ongoing for about two weeks since she started taking the weight loss medication SLIMQUICK®. Diagnostic testing was ordered, including blood work to test liver function.

13.     Mrs. Flowers-Smith was initially diagnosed with hepatitis of uncertain etiology. However, Dr. James Labuzzetta, the ED physician, documented that he performed research on SLIMQUICK® and quickly found that it contains many herbal supplements and that there was indeed a link between SLIMQUICK® and hepatotoxicity.

4

14.     The Gastroenterology ("GI") Service was consulted to see Mrs. Flowers-Smith.  It is documented that Mrs. Flowers-Smith stopped taking SLIMQUICK® on approximately November 18, 2013 due to the above-referenced symptoms.  Lab work was obtained and demonstrated that all of her liver function tests were elevated.  Her alkaline phosphatase was 210, AST 1851, and ALT 2680.  An ultrasound was negative, except for an incidental finding of three hemangiomas on the liver that were noted to be benign.

15.     Hepatocellular (liver) injury is manifested by an elevation of the hepatocellular enzymes alanine aminotransferase (ALT) and aspartate aminotransferase (AST).

16.     Mrs. Flowers-Smith was admitted to La Crosse Hospital for observation and monitoring for encephalopathy from November 22, 2013 through November 26, 2013.  She was treated with intravenous normal saline, Tramadol for pain and Zofran for nausea.  It was specifically noted that her abnormal liver function tests showed predominantly elevated transaminases, which was suggestive of some form of hepatocellular injury such as an infection or drug-induced toxicity.  After an exhaustive work-up ruled out an infectious etiology, such as hepatitis B and C, HIV, Wilson's disease and autoimmune hepatitis, it was determined that Mrs. Flowers-Smith's injuries were drug-induced and stemmed from her ingestion of SLIMQUICK®.

17.     Mrs. Flowers-Smith was monitored closely for complications such as encephalopathy and bleeding.  Serial LFTs were ordered for every 12 hours.  With elevating levels of lab values, Mrs. Flowers-Smith was advised by GI that if her labs continued to rise, she would need to be transferred to Mayo Clinic, Rochester to be evaluated for a possible liver transplant.

18.     On November 26, 2013, Mrs. Flowers-Smith was transferred to the Mayo Clinic, Rochester.  She was admitted directly to the Gastroenterology and Hepatology Service for

evaluation and management of acute hepatitis.  Upon arrival Ms. Flowers-Smith was evaluated by Dr. Thomas Waterbury and had complaints of right upper quadrant ("RUQ") abdominal pain that worsened with movement and intermittent nausea.  Mrs. Flowers-Smith's admission records note that upon examination her abdomen was soft, tender to palpation in the RUQ, mildly distended and positive for mild hepatomegaly with tender liver edge.  She was also seen and examined by Dr. Robert Kraichely who concurred with Dr. Watebury that this was likely drug-induced liver injury.

19.     Mrs. Flowers-Smith remained hemodynamically stable and afebrile throughout her admission and did not demonstrate any evidence of encephalopathy.  Mrs. Flowers-Smith requested to be discharged from the hospital on November 28, 2013.  She agreed to close outpatient monitoring, including daily liver biochemical tests and INR testing.  This testing was to be done in Illinois where Mrs. Flowers-Smith had family, with the results transmitted to the gastroenterologist at the Mayo Clinic.  It is documented at the time of discharge that Mrs. Flowers-Smith remained icteric and that her liver biochemical tests were not improving.  She was educated on the symptoms she and her family would need to vigilantly monitor for that would suggest further deterioration of her liver function.

20.     Mrs. Flowers-Smith was discharged on November 28, 2013 with a diagnosis of acute hepatitis.  It was noted that given her significant elevation of transaminases over 3000, that it appeared to be a hepatocellular injury that is likely drug-induced in etiology.  Hepatic ischemia was noted to be an unlikely consideration.  Her discharge instructions cautioned Mrs. Flowers-Smith to avoid any potential hepatotoxins, including SLIMQUICK®.

21.     Post-discharge labs were obtained at Advocate Christ Medical Center in Illinois.  Mrs. Flowers-Smith then continued to undergo outpatient serial lab work when she was returned

6

home as well.  While Mrs. Flowers-Smith's labs eventually began to trend back to normal, it was not until March 17, 2014 that even some of her liver-related lab values normalized.  She endured symptoms throughout.

22.    Mrs. Flowers-Smith was seen on January 16, 2014 by Dr. Gregory Cramer at the Gastroenterology Clinic at La Crosse.  Dr. Cramer noted that Mrs. Flowers-Smith was suffering from medication-induced hepatitis and was very ill but "eventually she turned the corner and is here for follow up today."  The medication was noted to be an over-the-counter weight loss supplement.  Mrs. Flowers-Smith is noted to be slowly improving, but still suffers from pruritus, fatigue and right upper quadrant discomfort.

23.    On January 28, 2014, the GI Department issued a letter to Mrs. Flowers-Smith's employer, indicating that Mrs. Flowers-Smith has been off work due to medication-induced liver failure and continues to suffer from fatigue, pruritus and right upper quadrant discomfort.  She was instructed to stay off work until March 17, 2014, when she would be reevaluated and it would be determined at that time if she needed additional time off work, or if she could go back to full or light duty.

24.    Mrs. Flowers-Smith again presented to Dr. Cramer on March 17, 2014 for a follow-up visit/reevaluation.  Dr. Cramer noted that Mrs. Flowers-Smith was a patient who had severe hepatitis and hepatic failure resulting from an over-the-counter herbal medication.  She was noted to have eventually recovered after a prolonged period of time.  As of that date, her liver enzymes were almost back to normal with very minimal elevation in ALT and slight elevation of alkaline phosphatase.  Mrs. Flowers-Smith was ordered to have lab work in 3 months and was released to return to work.

25.     Mrs. Flowers-Smith has incurred substantial medical expenses as a result of her SLIMQUICK® related injury.  Furthermore, it is anticipated that Mrs. Flowers-Smith will need continued monitoring of her condition by a specialist, and potentially additional treatment, even a liver transplant, depending upon her disease course.

26.     Mrs. Flowers-Smith was unable to work while hospitalized and during her prolonged recovery period.  Due to the severity of her injuries, she was forced to take a leave of absence and missed work from November 22, 2013 through March 17, 2014.

27.     Mrs. Flowers-Smith endured months of pain and suffering as the result of liver toxicity.  As a hospital worker, she is acutely aware of the complications associated with liver toxicity.  Furthermore, it is certainly possible that Mrs. Flowers-Smith has sustained permanent damage to her liver, or irreversible scarring.  She is clearly more susceptible now to future injury to her liver.

## THE WELLNX "WEIGHT LOSS" PRODUCTS

28.     Defendants market, distribute, develop, design, create, supply, test, formulate, compound, produce, create, portray, recommend, merchandize, advertise, package, promote, cause to be manufactured and/or sell multiple lines of weight loss dietary supplement products. One such line is known as the SLIMQUICK® line.

29.     The SLIMQUICK® line was launched in or about 2005.

30.     The SLIMQUICK® product line includes SLIMQUICK® Fat Burner, SLIMQUICK® Ultra Fat Burner, SLIMQUICK® Caplets, SLIMQUICK® Caffeine Free Caplets, SLIMQUICK® Mixed Berries Packets, SLIMQUICK® RAZOR™ and SLIMQUICK® EXTREME.

31.     Shortly after its launch, SLIMQUICK® captured a substantial market share of the weight loss products purchased by United States consumers, particularly women. On information and belief, consumers in the United States have paid well in excess of $100 million to purchase SLIMQUICK® products. While it is not possible to know exactly how many consumers across the United States purchased these products, a conservative estimate would be in the many hundreds of thousands.

32.     The following claims and statements are made on the SLIMQUICK® package or on the package insert and are therefore made directly to the purchases of SLIMQUICK®.

33.     SLIMQUICK® is described by Defendants as being "Designed for Women™".

34.     Further, SLIMQUICK® is described as a breakthrough formula that is "scientifically developed to overcome the physiological and hormonal barriers women face in losing fat" and contains "6 exclusive complexes" which support fat loss:

| COMPLEX NAME | ACTION IN FEMALE BODY AND INGREDIENTS |
|---|---|
| CYCLOVITE | A proprietary blend of the specific vitamins and minerals needed by women to support fat loss; contains Vitamin D, Vitamin B-6, Vitamin B-12, folic acid, calcium and Vitamin K |
| NUTRATHERM THERMOGENIC | Increases thermogenesis and metabolic rate without "overstimulating"; contains Green Tea extract, Caffeine, Cocoa bean extract, Yerba mate and Clary Sage extract (emphasis added) |
| ESTROTRIM HORMONE BALANCING | Helps support a proper hormonal profile to optimize weight loss, reduce body fat storage, reduce PMS and control appetite; contains Soy isoflavons and Vitex agnus-castus |
| CORTIFEM | Stress Reducing Complex: Helps support the reduction of various stress-related hormones, some of which are responsible for increasing body fat and decreasing muscle tone in women; contains Beta-sisosterol, Phophatidylserine, Rhodiola Rosea root extract and Theanine |
| AQUAPLEX WATER REMOVAL | Helps reduce excess water retention and bloating; contains Dandelion leaf and root, Horse tail, Uva Ursi extract and French maritime pine extract (emphasis added) |
| XTEND ABSORPTION | Helps improve absorption of the SLIMQUICK® formula as well as delivering a gradual dose of the ingredients so that your metabolism is elevated all day long — without overstimulating; contains Cellulose ethers and Piper nigum |

35.    On information and belief, SLIMQUICK® contains ingredients known to be harmful to human health, and in particular, toxic to the liver (hepatotoxic).

36.    SLIMQUICK® contains *Camellia sinensis* (Green Tea Extract) and *Arctostaphylos uva-ursi* (Uva-ursi).   Both ingredients are known hepatotoxins.

## DIETARY SUPPLEMENT REGULATION

37.    Prior to 1994, dietary supplements were regulated as a "food" by the United States Food and Drug Administration ("FDA").   As a food, supplements were subject to the FDA's safety evaluation of all new ingredients. This regulatory scheme dramatically changed when Congress passed the Dietary Supplement Health & Education Act of 1994 ("DSHEA"), which allowed the sale of dietary supplements without pre-market testing for safety or efficacy.

38.    Under DSHEA, the dietary supplement or dietary ingredient manufacturer is responsible for ensuring that a dietary supplement or ingredient is safe before it is marketed. The FDA does not become responsible for taking action against any unsafe dietary supplement product until after it reaches the market.   The elimination of pre-market testing and the absence of manufacturing regulations put the dietary supplements industry on the "honor system" to market and produce well-executed and safe products that were capable of delivering the benefits claimed. As a result, companies that otherwise might have been unwilling to enter the market due to the FDA's pre-market approval and manufacturing requirements were free to enter a market that was, in effect, unregulated.

39.    The passage of DSHEA was followed by an avalanche of dietary supplement products employing extensive advertising promising fast and easy weight-loss.

40.    Consumers, particularly young and middle-aged women, were eager to try out the products that promised weight loss. The use of dietary supplements for weight loss has become

increasingly popular, as reflected by the $55.4 billion spent in the United States in 2006 for weight loss and diet control.  Based on a study by the National Center for Complementary and Alternative Medicine (NCCAM), 36% of adults are using some form of complementary or alternative medicine.  Dara, L. et al., *Hydroxycut Hepatotoxicity: A Case Series and Review of Liver Toxicity From Herbal Weight Loss Supplements.* World J. Gastroenterol. 14(45): 6999-7004 (2008).

## THE DANGEROUS INGREDIENTS IN SLIMQUICK®

41.     SLIMQUICK® contains Green Tea Extract.  Green tea is obtained from the leaves of *Camellia sinensis.  Camellia sinensis* is an evergreen shrub with yellow-white flowers that was native to China, but is now cultivated worldwide in tropical and subtropical regions.

42.     *Camellia sinensis* is a known liver toxin.  *See* Bonkovsky, H.L. *Hepatotoxicity Associated with Supplements Containing Chinese Green Tea (Camellia sinensis).* Ann. Intern. Med. 144:68-71 (2006); Gloro, R. et al. *Fulminant Hepatitis During Self-Medication with Hydro Alcoholic Extract of Green Tea.* Eur. J. Gastroenterol. Hepatol. 17:1135-1137 (2005); Molinari M. et al. *Acute Liver Failure Induced by Green Tea Extracts: Case report and Review of the Literature.* Liver Translp. 12:1892-1895 (2006); Pedro, C. et al. *Liver Toxicity of Camellia Sinensis Dried Etanolic Extract*. Med Clin. 121:598-599 (2003); Schmidt, M. et al. *Toxicity of Green Tea Extracts and Their Constituents in Rate Hepatocytes in Primary Culture*. Food Chem. Toxicol. 43:307-314 (2005); Vial T., et al. *Acute Hepatitis Due to Exolise, a Camellia Sinensis Derived Drug*. Gastroenterol. Clin. Biol. 27:1166-1167 (2003); Abu el Wafa Y, et al. *Acute Hepatitis induced by Camellia Sinensis [green tea]*. An. Med. Interna. 22:298 (2005); Duenas, C. et al. *Hepatotoxicity Due to Camellia Sinensis*. Med. Clin. 122:677-678 (2004).

43.    Due to hepatotoxicity, a weight-loss supplement known as Exolise® was withdrawn from the market in France and Spain in 2003. Green tea extract (*Camellia sinensis*) was the major component of Exolise®. Vial T., et al. *Acute Hepatitis Due to Exolise, a Camellia Sinensis Derived Drug*. Gastroenterol. Clin. Biol. 27:1166-1167 (2003).

44.    Acute hepatic injury has also been linked to the *Camellia sinensis* in at least two other weight-loss supplements, The Right Approach (Pharmanex) and Hydroxycut (Iovate Health Sciences). Jones, F.J. et al. *Acute Live Injury Associated with the Herbal Supplement Hydroxycut in a Soldier Deployed to Iraq*. Am. J. of Gastroenterol. 102(10):2357-2358 (2007); Stevens, T. et al. *Two Patients with Acute Liver Injury Associated with Use of the Herbal Weight-Loss Supplement Hydroxycut*. Ann. Intern. Med. 142(6):477-478 (2005); Dara, L. et al. *Hydroxycut Hepatotoxicity: A Case Series and Review of Liver Toxicity From Herbal Weight Loss Supplements*. World J. Gastroenterol. 14(45): 6999-7004 (2008); Fong, T.L. et al. *Hepatotoxicity Due to Hydroxycut: A Case Serie*s. Am. J. Gastroenterol. 105(7): 1561-1566 (2010).

45.    Hydroxycut was recalled from the United States market in 2009, upon urging by the FDA, after receiving at least 23 reports of liver injury in Hydroxycut users.

46.    Green tea extracts have been marketed as effective weight-loss supplements. Although there is very little scientific evidence supporting the effectiveness of green tea extracts, serious side effects, including liver failure, are increasingly being reported. Krishna Y.R. et al. *Acute Liver Failure Caused by "Fat Burners" and Dietary Supplements: A Case Report and Literature Review*. Can. J. Gastroenterol. 25(3): 157-160 (2011).

47.    SLIMQUICK® also contains Uva ursi. Uva ursi, also known as *Arctostaphylos uva ursi* L. Sprengel, *Arbutus uva ursi* L., and Bearberry, is a low-growing evergreen shrub with

creeping stems that form a dark green carpet of leaves.  The leaves contain hydroquinone derivatives, mainly arbutin and methyl-arbutin in concentrations ranging from 5% to 15%.

48.    Hydroquinone is a liver toxin.  *See* Nowak, A.K. et al. *Darkroom Hepatitis After Exposure to Hydroquinone.* Lancet. 345:1187 (1995); Brooks, S. (Editor). *Botanical Toxicology.* Protocol. J. Botan. Med. 1(1):147-158 (1995); Kemper, K.J. *Uva Ursi (Arctostaphylos Uva-Ursi).* The Longwood Herbal Task Force. (1999); *Chemical Information Review Document for Arbutin [CAS No. 497-76-7] and Extracts from Arctostaphylos Uva-Ursi.* Prepared by Integrated Laboratory Systems, Inc. for the National Toxicology Program, National Institute of Environmental Health Sciences, National Institute of Health (2006).

49.    The Defendants knew or should have known that SLIMQUICK® contained ingredients that cause injury to humans, and in particular, liver injury.

50.    Indeed, while Defendants failed to warn of the risk of liver toxicity with SLIMQUICK® use, the boxes of SLIMQUICK® specifically instruct users to cease ingestion of SLIMQUICK® if the user experiences nausea, abdominal pain, dark urine or jaundice.  These are all symptoms of liver failure, indicating Defendants were well aware of the association between SLIMQUICK® and liver toxicity.

51.    Defendants make numerous misrepresentations regarding their products, including assertions that Defendants "[d]iligently identify and source key ingredients that are supported by comprehensive clinical substantiation of their effectiveness. We believe that scientific research must underlie each of our products to ensure we are contributing to the overall health and weight loss goals of our consumers" and "[w]e are passionate about quality. From sourcing high-quality key ingredients with clinical substantiation, to ensuring our manufacturing partners employ processes of the highest standard and are compliant with Good Manufacturing

13

Practices, to carrying out a rigorous analytical testing program on our finished products, our passion for quality is evident in everything we do."

## COUNT I: NEGLIGENCE

52. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

53. At all times herein mentioned, the Defendants caused to be manufactured, researched, designed, tested, formulated, compounded, produced, created, portrayed, distributed, recommended, marketed, merchandized, advertised, packaged, supplied, promoted and/or sold SLIMQUICK® as a weight loss supplement.

54. Defendants had a duty to Plaintiffs to exercise reasonable care in the researching, designing, testing, formulating, compounding, producing, creating, portraying, distributing, recommending, marketing, merchandizing, advertising, packaging, supplying, promoting, causing to be manufactured and/or selling of SLIMQUICK® into the stream of commerce, including a duty to assure that SLIMQUICK® would not cause users to suffer unreasonable, dangerous side effects such as liver toxicity.

55. Defendants' conduct foreseeably created an unreasonable risk to others, including Mrs. Flowers-Smith.

56. Defendants failed to exercise ordinary care and/or were reckless in manufacturing, researching, designing, testing, formulating, compounding, producing, creating, portraying, distributing, recommending, marketing, merchandizing, advertising, packaging, supplying, promoting, and/or selling SLIMQUICK® into interstate commerce in that Defendants knew or should have known that using SLIMQUICK® caused a risk of unreasonable, dangerous side effects, including liver toxicity.

14

57.    Despite the fact that Defendants knew or should have known that SLIMQUICK® was associated with and/or caused liver toxicity, Defendants continued to market, cause to be manufactured, produce, formulate, advertise, distribute, supply, promote and/or sell SLIMQUICK® to consumers, including Mrs. Flowers-Smith.

58.    Defendants had a duty to warn the public, in a timely fashion, of SLIMQUICK® being associated with/or causing liver toxicity, when it knew or should have known of the enhanced and/or unique risks associated with SLIMQUICK®.

59.    Defendants' duty extended beyond the date that its SLIMQUICK® products were obtained for use.  Had Mrs. Flowers-Smith received a proper or adequate post-sale warning as to the risks associated with the use of Defendants' SLIMQUICK® product, she could have avoided her injuries, protracted medical treatments and evaluations as to the nature of her injury and medical condition.

60.    Defendants refused to warn consumers about the risk of liver toxicity associated with SLIMQUICK®.

61.    Defendants failed to conduct adequate post-marketing testing and surveillance to identify the risk posed to consumers of SLIMQUICK®.

62.    Defendants knew or should have known that consumers such as Mrs. Flowers-Smith would foreseeably suffer injury because of Defendants' failure to exercise ordinary care, as set forth above.

63.    Defendants breached their duty of reasonable care owed to Mrs. Flowers-Smith to design SLIMQUICK® in a reasonably safe manner and to warn of the dangers of liver toxicity and other dangers and health risks.

64.    The Defendants' breach was the proximate cause of Mrs. Flowers-Smith's injury. As a direct and proximate consequence of Defendants' acts, omissions, negligence, failure to issue a timely post-sale warning and/or recklessness, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life.

65.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

## COUNT II: STRICT LIABILITY (WISCONSIN STATUTE § 895.047(2))

66.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

67.    Defendants are strictly liable for selling and distributing SLIMQUICK® in the same manner that Defendants are liable for causing the manufacturing of SLIMQUICK®, a defective product.

68.    Defendants, as sellers or distributors of SLIMQUICK®, have contractually assumed one or more of the manufacturer's duties to manufacture, design, or provide warnings or instructions with respect to SLIMQUICK®.

16

69.    As a direct and proximate consequence of Defendants' acts, omissions, negligence, failure to issue a timely post-sale warning and/or recklessness, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life.

70.    As a further direct and proximate result of her use of SLIMQUICK®, Mrs. Flowers-Smith has suffered injuries and is entitled to recover damages.

71.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

## COUNT III: COMMON LAW STRICT LIABILITY- DESIGN DEFECT

72.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

73.    Defendants placed a defective product on the market.

74.    The defective product was sold in an unreasonably dangerous condition.

75.    SLIMQUICK® was not fit for its intended use and could have been designed/manufactured and promoted differently (safely) without exposing Mrs. Flowers-Smith to unreasonable health risks.

17

76.     Defendants failed to conduct adequate post-marketing testing and surveillance to identify the risks posed to consumers of SLIMQUICK®.

77.     SLIMQUICK® reached Mrs. Flowers-Smith without change in the condition in which the product was sold.

78.     Defendants had a duty to warn the public in a timely fashion, and to warn with regard to SLIMQUICK®'s association with and/or cause of liver toxicity, when it knew or should have known of the enhanced and/or unique risks associated with SLIMQUICK®.

79.     Defendants' duty extended beyond the date that its SLIMQUICK® products were obtained for use.  Had Mrs. Flowers-Smith received a proper or adequate post-sale warning as to the risks associated with the use of SLIMQUICK®, she could have avoided her injuries and protracted medical treatments and evaluations as to the nature of her injury and medical condition.

80.     The defective product, SLIMQUICK®, is the cause of Mrs. Flowers-Smith's serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life.

81.     As a further direct and proximate result of her use of SLIMQUICK®, Mrs. Flowers-Smith has suffered injuries and is entitled to recover damages.

82.     WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and

punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

## COUNT IV: STRICT LIABILITY- COMMON LAW FAILURE TO WARN

83. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

84. Defendants placed a defective product on the market.

85. The defective product was sold in an unreasonably dangerous condition.

86. SLIMQUICK® lacked a warning regarding liver toxicity and the Defendants failed to adequately warn Mrs. Flowers-Smith of the risks associated with its use, which were known by the Defendants.

87. Defendants failed to conduct adequate post-marketing testing and surveillance to identify the risk posed to consumers of SLIMQUICK®.

88. SLIMQUICK®, as manufactured and/or supplied by the Defendants, was defective due to inadequate post-marketing warnings and/or instructions because, after the Defendants knew or should have known of the risks of liver toxicity from SLIMQUICK® use, they failed to provide adequate warnings of the dangers of the product to Mrs. Flowers-Smith and continued to aggressively promote SLIMQUICK®.

89. Due to the inadequate warnings regarding liver toxicity, SLIMQUICK® was in a defective condition and unreasonably dangerous at the time that it left the control of the Defendants.

90. Defendants failed to adequately warn Mrs. Flowers-Smith of human and animal study results pertaining to liver toxicity and SLIMQUICK® (via *Camellia sinensis and uva-ursi*).

19

91.    Defendants' failure to adequately warn Mrs. Flowers-Smith of a liver toxicity risk prevented her from correctly and fully evaluating the risks and benefits of SLIMQUICK®.

92.    Defendants had a duty to warn the public in a timely fashion, and to warn with regard to SLIMQUICK® that it was associated with and/or caused liver toxicity, when it knew or should have known of the enhanced and/or unique risks associated with SLIMQUICK®.

93.    Defendants' duty extended beyond the date that its SLIMQUICK® products were obtained for use.  Had Mrs. Flowers-Smith received a proper or adequate post-sale warning as to the risks associated with the use of Defendants' product, she could have avoided her injuries and protracted medical treatments and evaluations as to the nature of her injury and medical condition.

94.    SLIMQUICK® reached Mrs. Flowers-Smith without change in the condition in which the product was sold.

95.    As a direct and proximate consequence of the defective warning on SLIMQUICK®, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life.

96.    As a direct and proximate result of her use of Defendants' product, SLIMQUICK®, and Defendants' failure to timely provide post-sale warnings, Mrs. Flowers-Smith has suffered and continues to suffer from serious injuries, including, but not limited to, pain and suffering, physical injuries, embarrassment, mental anguish, loss of capacity for the

20

enjoyment of life, expenses of hospitalization and medical treatment, loss of earnings, potential loss of the ability to earn money in the future, and a shortened life span.

97.    As a further direct and proximate result of her use of SLIMQUICK®, Mrs. Flowers-Smith has suffered injuries and is entitled to recover damages.

98.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

**COUNT V: MISREPRESENTATION**

99.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

100.    Defendants made a misrepresentation of material fact and/or omitted material information to/from Mrs. Flowers-Smith at the time of her purchase of SLIMQUICK®.

101.    The Defendants misrepresented the safety of SLIMQUICK® by omitting:

a.    that SLIMQUICK® was not safe;

b.    that the risks of adverse events, including liver toxicity, with SLIMQUICK® were high;

c.    that the risks of adverse events associated with SLIMQUICK®s were not adequately tested and/or known by the Defendants.

d.    that Defendants were aware of dangers associated with the use of SLIMQUICK®, in addition to and above and beyond those associated with alternative medications;

e.    that SLIMQUICK® was defective, and that it caused dangerous side effects; and

f.    that consumers needed to be monitored more regularly than normal while using SLIMQUICK®.

102.    Defendants either knew of the misrepresentations and/or omissions, or made the misrepresentations and/or omissions without the knowledge of their truth or falsity, or should have known the representations/omissions were false and misleading.

103.    The representations were made with the intent to induce others, including Mrs. Flowers-Smith, to act on the misrepresentations/omissions and Mrs. Flowers-Smith justifiably and foreseeably relied on them.

104.    As a result, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life, in justifiable reliance on the misrepresentations.

105.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000, and punitive damages together with costs, interest, and such other and further relief as may be deemed just and proper.

## COUNT VI: BREACH OF EXPRESS WARRANTY

106.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

107.    The SLIMQUICK® product materially failed to conform to those representations made by Defendants on the box, in package inserts, and otherwise, concerning the properties and effects of the SLIMQUICK® products, respectively manufactured and/or distributed and sold by

22

Defendants, and which Mrs. Flowers-Smith purchased and ingested in direct or indirect reliance upon those express representations. Such failure by Defendants constituted a material breach of express warranties made, directly or indirectly, to Mrs. Flowers-Smith concerning SLIMQUICK® sold to her.

108. As a direct, foreseeable and proximate result of Defendants' breaches of express warranties, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life. Mrs. Flowers-Smith purchased and ingested SLIMQUICK® as instructed, leading to her injuries.

109. In compliance with Wisconsin Statutes § 402.607(3)(a), an email was sent to Defendants' in-house attorney, Don Beshada, regarding Mrs. Flowers-Smith's SLIMQUICK® claim. Mrs. Flowers-Smith received no response.

110. WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

<b><u>COUNT VII: BREACH OF IMPLIED WARRANTY</u></b>

111. Plaintiffs repeat, reiterate, reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

23

112.    Defendants impliedly warranted their respective SLIMQUICK® products, which they manufactured and/or disturbed and sold, and which Mrs. Flowers-Smith purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the products were sold.

113.    Defendants breached their implied warranties of the SLIMQUICK® products sold to Mrs. Flowers-Smith because these products were not fit for their common, ordinary, and intended use.

114.    As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Mrs. Flowers-Smith suffered serious and dangerous side-effects including liver toxicity, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, a risk of future liver problems, reasonable fear of future transplant, and all life complications caused by her liver toxicity, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above, and/or a shortened life, when, in reasonable reliance upon the implied warranties, she began using SLIMQUICK®.  Mrs. Flowers-Smith purchased and ingested SLIMQUICK® as instructed, leading to her injuries.

115.    In compliance with Wisconsin Statutes § 402.607(3)(a), an email was sent to Defendants' in-house attorney, Don Beshada, regarding Mrs. Flowers-Smith's SLIMQUICK® claim.  Mrs. Flowers-Smith received no response

116.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000, and punitive damages together with costs, interest and such other and further relief as may be deemed just and proper.

## COUNT VIII: LOSS OF CONSORTIUM

117.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

118.    As a direct and proximate result of Defendants' wrongful conduct detailed above, Plaintiff Harvey Smith, spouse of Plaintiff Cynthia Flowers-Smith, was deprived of the care, consideration, compassion, consortium and concern of Plaintiff Cynthia Flowers-Smith, and has suffered injuries and damages thereby.

119.    Plaintiff Harvey Smith is thereby entitled to an award of damages for loss of consortium.

120.    WHEREFORE, Plaintiff Smith demands judgment against each Defendant, jointly and severally, for an award of damages for his loss of consortium.

## COUNT IX: PUNITIVE DAMAGES (WISCONSIN STATUTE § 895.043)

121.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

122.    Mrs. Flowers-Smith's injury was caused by misconduct of the Defendants that manifested a flagrant disregard for Mrs. Flowers-Smith.  Defendants acted maliciously toward Mrs. Flowers-Smith or in an intentional disregard of her rights.  Defendants disregarded the safety of persons who might be harmed by the product SLIMQUICK®.

123.    Defendants fraudulently and in violation of applicable regulations withheld from the public and Mrs. Flowers-Smith information known to be material and relevant to the dangers associated with her use of SLIMQUICK®.

124.    By reason of the foregoing, Defendants are liable to Mrs. Flowers-Smith for punitive damages, for the researching, designing, testing, formulating, compounding, producing,

creating, portraying, distributing, recommending, marketing, merchandizing, advertising, packaging, supplying, promoting, causing to be manufactured and/or selling of a product that is defective.

125. WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages, together with costs, interest and such other and further relief as may be deemed just and proper.

**COUNT X: VIOLATION OF WISCONSIN UNFAIR
MARKETING AND TRADE PRACTICES (WISCONSIN STATUTE § 100.18)**

126. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

127. Wisconsin Statutes § 100.18 was enacted to protect the consuming public from those who engage in untrue, deceptive or misleading acts or practices in the conduct of marketing trade or commerce.

128. The conduct of Defendants, as alleged above, constituted untrue, deceptive or misleading acts or practices in violation of Wisconsin Statutes § 100.18.

129. Defendants violated Wisconsin Statutes § 100.18 by, among other things, representing to Mrs. Flowers-Smith that SLIMQUICK® had characteristics, ingredients, uses, benefits or qualities that it did not have, specifically, that SLIMQUICK® was safe.

130. The representations made by Defendants were material to Mrs. Flowers-Smith's decision to purchase and use the SLIMQUICK® product.

131. As a direct, foreseeable and proximate result of the false, deceptive and misleading representations made by Defendants, Mrs. Flowers-Smith suffered grievous bodily injury and other loss, as described above, when, in reasonable reliance upon the false, deceptive

and misleading representations, she began using SLIMQUICK®.  Mrs. Flowers-Smith purchased and ingested SLIMQUICK® as instructed, leading to her injuries.

132.    WHEREFORE, Plaintiff Flowers-Smith demands judgment against each Defendant, jointly and severally, for compensatory damages in a sum in excess of $75,000 and punitive damages, together with costs (including statutory costs and attorneys' fees), interest and such other and further relief as may be deemed just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, as follows:

a.    Awarding actual damages to the Plaintiffs incidental to Mrs. Flowers-Smith's purchase and use of SLIMQUICK® in an amount to be determined at trial;

b.    Awarding treble and/or punitive damages to the Plaintiffs;

c.    Awarding pre-judgment and post-judgment interest to the Plaintiffs;

d.    Awarding the costs and the expenses of this litigation to the Plaintiffs;

e.    Awarding reasonable attorneys' fees and costs to the Plaintiffs as provided by law; and

f.    Granting all such other relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues triable to a jury.

/s/ Douglas P. Dehler
Douglas P. Dehler (WI Bar No. 1000732)
Doug.Dehler@wilaw.com
Laura J. Lavey (WI Bar No. 1079346)
Laura.Lavey@wilaw.com
O'NEIL, CANNON, HOLLMAN, DEJONG &
LAING S.C.
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
P: 414.276.5000
F: 414.276.6581

27

Richard J. Arsenault (To be admitted *Pro Hac Vice*)
rarsenault@nbalawfirm.com
Dawn M. Chmielewski (To be admitted *Pro Hac Vice*)
dchmielewski@nbalawfirm.com
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71309
P: 800.256.1050
F: 318.561.2591

John R. Climaco (To be admitted *Pro Hac Vice*)
jrclim@climacolaw.com
CLIMACO, WILCOX, PECA, TARANTINO & GAROFOLI, CO. LPA
55 Public Square, Suite 1950
Cleveland, Ohio 44119
P: 216.621.8484
F: 216.771.1632

Jerrold S. Parker (To be admitted *Pro Hac Vice*)
Jerry@yourlawyer.com
Jordan L. Chaikin (To be admitted *Pro Hac Vice*)
jchaikin@yourlawyer.com
PARKER WAICHMAN LLP
3301 Bonita Beach Road, Suite 101
Bonita Springs, Florida 34134
P: 239.390.1000
F: 239.390.0055

Eric D. Holland (To be admitted *Pro Hac Vice*)
eholland@allfela.com
HOLLAND GROVES SCHNELLER & STOLZE, LLC
300 North Tucker Boulevard, Ste. 801
St. Louis, Missouri 63101
P: 314.241.8111
F: 314.241.5554